UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ANTONEO JONTE WILLIAMS,                )
                                       )
              Petitioner,              )
                                       )
v.                                     )          No. 3:16-CV-00062-JRG-DCP
                                       )
WARDEN CHERRY LINDAMOOD,               )
                                       )
              Respondent.              )

**MEMORANDUM OPINION**

Presently before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. §

2254 [Doc. 2] filed pro se by Petitioner Antoneo Jonte Williams.  Respondent has filed an answer

to the petition [Doc. 23] along with the state court record [Doc. 22].  Petitioner has filed a reply to

the answer [Doc. 26] and a motion to supplement the record [Doc. 32].

For the following reasons, Petitioner's § 2254 petition [Doc. 2] will be **DENIED** and this

action will be **DISMISSED WITH PREJUDICE**.  Petitioner's motion to supplement the record

[Doc. 32] also will be **DENIED**.

I.     **PROCEDURAL HISTORY**

On January 22, 2013, Petitioner was charged in a five-count presentment in Knox County,

Tennessee, with attempted second degree murder, employing a firearm during a dangerous felony,

and two counts of aggravated assault and reckless endangerment [Doc. 22-1 at 7–9].  Following a

trial, a jury returned a verdict of guilty on all counts [Doc. 22-2 at 36–37].  Following a bifurcated

hearing, the jury also found that Petitioner was a criminal gang member who committed criminal

gang offenses, which resulted in enhanced punishment for the attempted murder and two

aggravated assault convictions [*Id.* at 37]. Petitioner was sentenced to an effective sentence of fifty-three years in confinement [Doc. 22-2 at 98–102].

Petitioner appealed his conviction and sentence to the Tennessee Court of Criminal Appeals ("TCCA") raising three issues: (1) the trial court erred by denying his motion to suppress his audio-recorded conversation with a fellow jail inmate in violation of the Sixth Amendment; (2) the trial court erred by finding sufficient evidence existed to support his convictions; and (3) the trial court improperly enhanced his sentence by taking into consideration his juvenile criminal history [Doc. 22-15 at 4]. The TCCA affirmed Petitioner's conviction and sentence and Petitioner's application for permission to appeal was denied by the Tennessee Supreme Court. *State v. Williams*, No. E2014–01076–CCA–R3–CD, 2015 WL 5023136 (Tenn. Crim. App. Aug. 25, 2015) *perm. app. denied* (Tenn. Jan 15, 2016). Petitioner did not seek post-conviction relief in the state court.

## II.    FACTUAL BACKGROUND

The TCCA opinion contains a lengthy recitation of the testimony and evidence adduced at Petitioner's trial. Because Petitioner raises a sufficiency of the evidence claim, the Court includes the TCCA summary in whole as follows:

> Michael Mayes of Knox County 911 testified that on June 5, 2012, the 911 center received calls about a shooting. The State played the audio-recorded calls for the jury. During the first call, which was recorded at 3:31 p.m., a woman reported that she was stopped at a stoplight at the intersection of Martin Luther King Avenue and Chestnut Street when shots "rung out." She said that she [sic] that she heard "Celos" and four gunshots, that the shots were directed at three African–American "boys," and that the boys ran behind "the old drycleaners." She said that the gunshots were coming from the "side of the store" and that "the guy getting shot at he fell but got up and starting running." She stated that the boys were "getting ready to shoot back" but ran away. One of them was wearing a brown shirt, one was wearing a black shirt, and one was wearing a red shirt. She said a window at a business on Martin Luther King had been "shot out." During the second call, which was recorded at 3:34 p.m., a man reported that some "guys" shot out the window of his business

and that "they coming through the alley right now, all three of them." He stated that "I'm chasing the guys right now" and that "the one with a red shirt" had a gun.

Nineteen-year old Carlos Bennett testified that on June 5, 2012, he was walking on Martin Luther King Avenue in Knoxville with Barry McRae and Kaleb McClanhan and heard someone call his nickname, "Celo." He said he turned around and "heard some shots go off." He said that he had been shot previously, that he looked down at his chest, and that he "took off running." At first, Mr. Bennett said that he saw the appellant, who was sitting in a car, shooting at him and that he heard two or three gunshots. However, he then stated that he did not see the appellant firing the gun. He said he did not remember telling a police officer that the appellant was the shooter. The State played an audio-recording of Mr. Bennett's conversation with an officer. After the State played the recording, Mr. Bennett acknowledged telling the officer that the appellant shot at him.

On cross-examination, Mr. Bennett testified that he did not see the appellant shooting and that someone told him the appellant was the shooter. He said that on the day of the shooting, he was wearing a black shirt and that no one was wearing a red shirt. He estimated that the car was twenty-five to thirty yards away at the time of the shooting but acknowledged that it could have been thirty to fifty yards away. He also acknowledged that he did not want to testify against the appellant and was doing so under subpoena.

On redirect examination, Mr. Bennett testified that he ran because "I didn't want to get hit, especially if I ain't got mine on me." He said that if he had had his gun, "it would have been two different stories."

Twenty-one-year-old Mackenzie Coleman testified that in June 2012, she was dating Rodney Miller and staying with the Miller family. Rodney lived in an apartment in Morningside Hills in East Knoxville with his mother, who had a black Nissan Maxima, and his brother, James. She said that she knew the appellant as "Tone," that the appellant was Rodney's friend, and that the appellant "would come there some nights and maybe leave the next day and then come back again." Ms. Coleman acknowledged that she was testifying against the appellant under subpoena.

Ms. Coleman testified that on June 5, 2012, she was supposed to have an interview at KFC on Western Avenue. She left for the interview driving the black Maxima, and Rodney, James, and the appellant rode with her. She said that Rodney was sitting in the front passenger seat, that James was sitting behind Rodney, that the appellant was sitting behind her, and that "we were just riding around I guess until the interview." Ms. Coleman said that as she was driving on Martin Luther King Avenue, she saw three "boys" walking. One of them was Carlos Bennett, and the appellant told her to stop the car. She asked why, and the appellant said that "it's Athens Park." She stopped the car, the appellant got out, and the appellant started

shooting. The appellant fired the gun three times. She stated that she did not know the appellant was going to shoot at anyone and that she drove to a park. She was mad and upset after the shooting because she was trying to obtain custody of her infant son at the time.

Ms. Coleman testified that she, Rodney, James, and the appellant left the park and returned to the Miller apartment. The police arrived, and she talked with them but denied knowing anything about the shooting. However, she ultimately told them that the appellant "started shooting." On June 18, 2012, the police showed her a photograph array, and she identified the appellant's photograph.

On cross-examination, Ms. Coleman testified that she looked in her rearview mirror just before the shooting. She saw the three boys turn around and face the back of the Maxima. She could see the sides of their faces and that Mr. Bennett was wearing a white shirt. She acknowledged that after she, Rodney, James, and the appellant left the park, she drove to her interview at KFC. The three males waited in the car during her interview.

Officer Joey Whitehead of the Knoxville Police Department (KPD) testified that on June 5, 2012, he responded to a shooting in East Knoxville. A man had reported that "his business had been shot" and that he was following the possible suspects toward Magnolia Avenue. Officer Whitehead made contact with the suspects at the corner of Magnolia and Olive Street, questioned them, and determined that they were the victims of the shooting. The police began looking for a dark-colored Nissan Maxima, and Officer Whitehead's supervisor learned of a possible location for the car. Officer Whitehead went to the Morningside Apartments, and his supervisor walked through the apartment complex and found the car's owner. Officer Whitehead said that he saw the car and that the appellant and Rodney Miller were inside it. Officer Whitehead spoke with Rodney, Rodney's mother, and Mackenzie Coleman. He said that the appellant "fled" from the Maxima. Officer Whitehead's supervisor found a shell casing in plain view in a driver-side door panel, and Rodney's mother gave the officers permission to search the car.

On cross-examination, Officer Whitehead testified that the appellant did not violate any law by leaving the Maxima. He acknowledged that the appellant "just walked away" and that the appellant had every right to do so.

Danielle Wieberg, an evidence technician for the KPD, testified that on June 5, 2012, she received a call about the shooting and arrived at the scene about 4:30 p.m. She photographed a damaged window and collected a small piece of "brass" that appeared to be "the fragment of the jacket that had peeled off the bullet." The fragment was on the ground directly in front of the broken window. She said the lead from the bullet "was almost completely flattened and sitting inside between the panes of glass that it had hit." About 9:00 p.m., Ms. Wieberg was called to an address where officers thought they had located the car involved in the shooting.

When she arrived, officers had collected a .38 Special bullet casing from the car and an unfired 357 cartridge from an apartment.

On cross-examination, Ms. Wieberg testified that a revolver could fire both a .38 Special cartridge and a 357 cartridge. On redirect examination, she testified that casings remained inside a revolver but were ejected from semi-automatic firearms. She did not recover any casings at the scene of the shooting.

Ira Grimes testified that in June 2012, he owned a business on Martin Luther King Avenue. On the afternoon of June 5, Mr. Grimes was inside his store with four people. He said that he heard "a loud boom," that he went outside, and that he saw three males "running on the side of the building." Mr. Grimes, thinking that the males had done "something they shouldn't have," ran after them. He caught up with them, called 911, and waited for the police to arrive. He said that a bullet had broken his window and that the window saved his life because the bullet "could have very easily hit me, [or] the chair that I was sitting in when I heard the boom." The State asked the appellant to stand, and Mr. Grimes said that he did not know the appellant.

On cross-examination, Mr. Grimes testified that he heard only one gunshot. He said he did not see the shooter and "took it upon myself to think it was the guys that was on the side of the building." When the police arrived, they arrested two of the males. Mr. Grimes said he did not get close enough to see if any of the males was carrying a gun. The State played an audio-recording of Mr. Grimes talking with a police officer, and Mr. Grimes acknowledged telling the officer that one of the males had a gun. He explained to the jury, "I felt like when they made a move, somebody made a move ... like they might have had a gun and I stopped pursuit right then." A couple of days after the shooting, Carlos Bennett came to Mr. Grimes's store and apologized, telling Mr. Grimes that he "[d]idn't mean to bring no trouble" to Grimes. Mr. Bennett told Mr. Grimes that he was not the shooter, that he was just walking down the street at the time of the shooting, and that he did not have any money to replace the broken window. Mr. Grimes accepted Mr. Bennett's apology.

William Phillips testified that in April 2013, he and the appellant were inmates at the Knox County Detention Facility. Mr. Phillips said that he had been working with the KPD on a "cold" case that had nothing to do with the appellant, that he wore an audio-recorder, and that he turned on the recorder every time he left his cell. Mr. Phillips stated that on April 29, 2013, the appellant "called [Phillips] over to his cell" and that the appellant "started talking about his case." Mr. Phillips said that he asked the appellant "what he did" and that the appellant told him "what he had done." He asked if the appellant had hurt anyone, and the appellant said, "[N]o, I didn't hit a thing." Mr. Phillips gave the recording to Detective Jeff Day.

The State played the recording for the jury. On the recording, the appellant said, "You seem like you know a little bit about the law, man." Mr. Phillips stated, "I ain't no damn lawyer." The appellant asked Mr. Phillips about waiving a

preliminary hearing, and Mr. Phillips stated, "I guess it depends on what you're here for, and I typically don't ask. What's your deal?" The appellant said he was being held on an attempted murder charge and asked, "You think they will dismiss it?" Mr. Phillips stated, "That I don't know.... [W]hat have they got on ya?" The appellant told Mr. Phillips that he shot but missed, that he hit a window, and that nobody got hurt.

On cross-examination, Mr. Phillips testified that he was not expecting anything from the State in exchange for his testimony and that "I've been told from my attorney that there will be nothing offered for this." He acknowledged that he had cooperated with the State "on other matters" and that he agreed to plead guilty in exchange for a sentence of one year in jail and nine years on probation. He said, though, that he entered the agreement "back last January and all of this took place after the fact." He said that he never initiated any questions with the appellant and that "I followed up with the questions that he asked me."

Mr. Phillips testified that he had other conversations with the appellant and that he did not remember any of them being about the appellant's case. He said that at the beginning of his conversation with the appellant on April 29, the appellant said he wanted to talk with Mr. Phillips because Mr. Phillips may know something about the law. Mr. Phillips told the appellant that he was not a lawyer, but the appellant "continued to ask questions." Mr. Phillips said he thought the appellant was being truthful about the facts of the case because "[he] had no reason to lie to me."

Detective Jeff Day of the KPD testified that he gave Mr. Phillips a recording device and that he did not know the appellant on April 29, 2013. Mr. Phillips returned the device to Detective Day, and Detective Day "downloaded" Mr. Phillips's conversation with the appellant.

Fifteen-year-old James Miller testified for the appellant that he knew the appellant "from around the way." On the day of the shooting, James was "riding around" with Mackenzie Coleman. They saw the appellant and stopped to give him ride. Ms. Coleman was driving, James was sitting in the rear passenger seat, and the appellant was sitting behind Ms. Coleman. James's brother, Rodney, was not present.

James testified that while they were stopped at the intersection of Martin Luther King and Chestnut, they saw some people "mugging" the car. He said that by "mugging," he meant that they were looking at the car "in a mean way." The appellant got out of the car and said, "[W]hat's up." James said that he did not know if an argument or an altercation was in progress but that the appellant "tensed up." James said that he heard gunshots but that the shots did not sound like they came from the appellant because "if it was close to me, you know, I would have had sound effects in my ear going off."

On cross-examination, James testified that the shooting occurred after Coleman's job interview and that one of the three people he saw on Martin Luther King was Carlos Bennett. James said he was worried that one of them was going to shoot at the car because "where I'm from if you're mugging, that means you are fixing to do something." The appellant told Ms. Coleman to stop the car, and James heard the appellant say "Celos." James said that he thought Celos was the appellant's "homey" and that "[n]ext thing I know I hear shots." James heard four gunshots and ducked down. He said he did not hear the appellant say, "Athens Park."

James testified that after the shooting, Ms. Coleman drove to the apartment in Morningside Hills. They told Rodney Miller what had happened and went to a park. Later that day, James gave a statement to the police in which he said that he, the appellant, and Ms. Coleman left the apartment together before the shooting, not that he and Ms. Coleman picked up the appellant. He also told the police that the appellant "said Celos and then went boom, boom, boom." He acknowledged that his statement to the police differed from his testimony but said that he was scared when he talked to the police. He also acknowledged that the day before trial, he told the assistant district attorney general that he was asleep in the car and was awakened by gunshots. He said he lied to her because "I didn't want to tell you nothing in order to keep it real. I just didn't want to tell you nothing." He said he did not know the identity of the shooter "[b]ecause it happened so fast."

Rodney Miller testified under subpoena that at the time of the shooting, he was at home in Morningside Hills. He said that on the evening of June 5, 2012, he told the police that he was not in the car at the time of the shooting. However, the police started "confusing" him, so he "just kind of got scared and lied" and said he was present. He said he learned about the shooting when "everybody got home ... they let me know what happened." He acknowledged that on the evening of June 5, a police officer saw him and the appellant in the Maxima at the apartment complex. However, he maintained that he was not in the car when the shooting occurred.

On cross-examination, Rodney testified that at the time of the shooting, he had known the appellant about one month. He acknowledged telling the police that the appellant was the shooter and that his account sounded like he witnessed the shooting. He said he had learned about the shooting from the appellant. According to the appellant, the car stopped; the appellant said, "Celos"; Celos put his hands up; and the shooting started. The State asked if the appellant began shooting at Celos, and Rodney answered, "I guess both of them from what I was told."

The twenty-year-old appellant testified that he was in the Maxima on June 5, 2012, but that he did not shoot at Bennett. The appellant said that on that day, he, Rodney Miller, and James Miller rode with Mackenzie Coleman to her interview at KFC. When they left KFC, Ms. Coleman was driving the Maxima, the appellant was sitting behind her, Rodney was sitting in the front passenger seat, and James was sitting behind Rodney. Ms. Coleman turned onto Martin Luther King, and they saw

three males, one of whom was Mr. Bennett. Rodney told Ms. Coleman to stop, Rodney got out of the car, and Rodney shot at Mr. Bennett. Rodney then got back into the car, and Ms. Coleman drove to the Morningside Apartments. When they arrived, Rodney's mother came outside and told Rodney that the police wanted to speak with him. The appellant left because he had a warrant for a probation violation. At some point, a detective interviewed the appellant. The appellant told the detective that he did not know Rodney or anything about the shooting.

The appellant testified that after his arrest in this case, he asked William Phillips for legal advice and that Mr. Phillips questioned him about his case. The appellant said that he had several conversations with Mr. Phillips, that he told Mr. Phillips "different stories every time," and that he told Mr. Phillips "anything" because other inmates were "trying to size [him] up."

On cross-examination, the appellant testified that in May 2012, he was living "everywhere" because his grandmother had evicted him from her home. The appellant met Rodney and stayed at the Miller apartment when Rodney's mother was at work. While the appellant was there, he saw one or two guns, and one of them was a revolver that he thought Rodney used during the shooting. The appellant said that at the time of the shooting, he had not seen Mr. Bennett since 2007. He said that he "ran with" the Athens Park Bloods and that he "had no clue" Mr. Bennett was a member of the Crips gang. The appellant acknowledged that he had "CK" tattooed on his face and that "CK" stood for "crip killer." He said, though, that he got the tattoo "a long time ago" and that "just because I got that on my face doesn't mean that I hate crips, no, that's not what it mean, not at all." He acknowledged that as a general rule, Bloods did not like Crips. However, he stated that he did not hate Crips and that "I run with a number of Crips. I just didn't hang around them every day." He denied having a gun on June 5, 2012, but said Rodney had one. The appellant said Rodney was a member of the Bloods, not the Athens Park Bloods.

The appellant acknowledged that he initiated the April 29 conversation with Mr. Phillips and that he told Mr. Phillips that he shot at Mr. Bennett but missed and hit a window. He said that he had thought Rodney was his friend and that he had planned to take the "rap" for Rodney but changed his mind. The appellant acknowledged having a prior conviction for criminal impersonation, receiving "write-ups" in jail, and pleading guilty to the "write-ups."

*Williams*, 2015 WL 5023136, *1–6.

In light of the evidence, the jury convicted Petitioner of the attempted second degree murder of Carlos Bennett, the aggravated assaults of Barry McRae and Kaleb McClanhan,

employing a firearm during the commission of a dangerous felony, and reckless endangerment. *Id*. at *6.

## III. STANDARD OF REVIEW

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, which amended § 2254, sets forth "an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007). By this standard, when a state court adjudicates a claim on the merits, habeas relief is available only if the adjudication of that claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's ruling is an "unreasonable application of" clearly established federal law if the state court identifies the correct governing legal principle from Supreme Court precedent but unreasonably applies it to the facts of the particular state prisoner's case. *Id*. at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id*. at 411.

Under the AEDPA, a habeas petitioner must "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This standard is "difficult to meet," "highly deferential," and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102; *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

## IV.    ANALYSIS

Petitioner's § 2254 petition raises three grounds for habeas relief: (1) the trial court erred in denying his motion to suppress his audio-recorded conversation with a fellow jail inmate which was made without counsel present in violation of the Sixth Amendment; (2) the evidence is insufficient to support his convictions of attempted second degree murder and aggravated assault; and (3) the trial court erred in enhancing his sentence based upon his juvenile criminal history [Doc. 2].

Respondent argues that relief is not appropriate on Petitioner's first two claims because the adjudication of those claims on the merits in state court did not result in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, or that was based on an unreasonable determination of the facts in light of the evidence presented [Doc. 23]. Respondent further asserts that claim three has been procedurally defaulted because it was not fairly or adequately presented to the highest available state court as a federal constitutional claim and is now barred from presentation to the state courts [*Id.*]

### A.    SIXTH AMENDMENT CLAIM

Petitioner's first claim alleges that the trial court erred in denying his motion to suppress his audio-recorded conversation with William Phillips, a fellow jail inmate at the Knox County Detention Facility [Doc. 2 at 5]. Specifically, he contends that Phillips was an informant acting as a government agent and that Phillips deliberately elicited incriminating information from him, violating his Sixth Amendment right to counsel. [Doc. 3 at 30–45].

Petitioner raised this claim on direct appeal and the TCCA adjudicated the claim on the merits, finding that the trial court properly denied the motion to suppress because Phillips was not acting as a government agent. *Williams*, 2015 WL 5023136, at *7-10. Respondent contends that the decision of the TCCA is entitled to deference under § 2254(d).

### 1. Factual Background

Prior to trial, Petitioner filed a motion to suppress the statements he made to Phillips [Doc. 22-1 at 113-116]. The trial court held a hearing on the motion, the relevant portions of which were summarized by the TCCA as follows:

> Detective Day testified that a couple of weeks before April 29, 2013, Mr. Phillips, who was an inmate in the Knox County Detention Facility, contacted the KPD "about a person in the detention facility that was talking about a homicide case, an apparent unsolved homicide." Detective Day, who primarily worked on unsolved cases, met with Mr. Phillips to talk about the case, which did not have anything to do with the appellant. Mr. Phillips agreed to keep a recording device with him and record some conversations with "the target." Detective Day instructed Mr. Phillips not to talk with the target about the target's pending charge. However, Mr. Phillips could talk with the target about anything else. Mr. Phillips would turn on the recorder before he left his cell and turn it off when he returned to his cell. Every couple of days, Detective Day would meet with Mr. Phillips to "see how [things] were going." Detective Day said that "when we finished our dealings, I got the device and downloaded the recordings off the recorder onto a disk."
>
> Detective Day testified that Mr. Phillips told him that while Mr. Phillips was on his way to talk with the target, "another gentleman had talked to him about another case." Mr. Phillips did not know the inmate's name, just his cell number, and Detective Day used the number to learn the name of the inmate, who was the

appellant. Detective Day contacted the investigator for the appellant's case and made a copy of the conversation for the investigator.

The State played the recording for the trial court. On the recording, Mr. Phillips can be heard walking through the jail, and then the following exchange occurs:

The appellant (calling out): You seem like you know a little bit about the law, man. Alright, listen.

Phillips (chuckling): I ain't no damn lawyer.

The appellant: I know you ain't no lawyer. I'm not going to ask you nothing like what about this, what about that.

Phillips: Ok.

The appellant: If my lawyer didn't tell me something, like whose fault is that[?]

Phillips: What did she not tell you?

The appellant: She been telling me that I couldn't have one. And I went to the library and I seen that I could have one.

Phillips: Have one of what, son?

The appellant: A preliminary hearing.

Phillips: Oh, okay.

The appellant: I went to the library and I seen it[.] [I]n the library the paper say that if they didn't give me one and I didn't waive it it should get dismissed because they denied me one.

Phillips: Well, I guess it depends on what you're here for, and I typically don't ask. What's your deal?

The appellant: I got an attempt.

Phillips: Attempted murder charge?

The appellant: Yep. I got a presentment. I don't got a warrant. I got a presentment.... My lawyer been telling me I couldn't have [a preliminary hearing.]

Phillips: Well, take it up with her when she calls you.
....

The appellant: You think they will dismiss it?

Phillips: That I don't know. You know, hell, what have they got on ya?

The appellant: Just he say she say.... Just somebody saying I shot at him. And I don't even see how that's attempted murder because didn't nobody get hurt. Didn't nobody get hurt at all, bro.

Phillips: You just shot at him? That's it?

The appellant: That's it. I missed. I didn't hit shit but a window. And ... the person whose window that I hit ... he don't even know who did it....

Phillips: So nobody got hurt?

The appellant: Nobody got hurt at all, bro.

On cross-examination, Detective Day acknowledged that he gave Mr. Phillips the recording device in order for Mr. Phillips to record a specific individual. The target individual was in jail for a rape charge, and Detective Day told Mr. Phillips that he could not talk with the target about the rape. Detective Day told Mr. Phillips, though, that he could talk with the target about anything else.

Captain Terry Wilshire of the Knox County Sheriff's Office testified that he was a facility commander for the Knox County Detention Facility and reviewed records related to the appellant and Mr. Phillips. On April 29, 2013, Mr. Phillips was not a trustee in the detention facility. Captain Wilshire did not find any record of disciplinary actions related to Mr. Phillips or the appellant. However, he found a September 14, 2013, incident report involving the two men.

*Williams*, 2015 WL 5023136, at *7–8.

At the conclusion of the testimony, the State argued that the trial court should deny the motion to suppress because Phillips was not targeting Petitioner, Petitioner was "the one who engaged Phillips about his case," and the State came to possess Petitioner's confession "by happenstance or luck." *Id*., at *8. The TCCA summarized the trial court's finding as follows:

The trial court stated that Mr. Phillips "did start pumping the defendant for information" and that Mr. Phillips "apparently saw an opportunity to maybe pick up some information from this fellow that might help him in the eyes of the police." However, the court ruled that Mr. Phillips was a state agent only with respect to the target individual, stating that "there was no instruction by the police to do anything

with Mr. Williams. It was not police action that caused the conversation between Bill Phillips and Mr. Williams. Mr. Williams initiated the conversation." The trial court concluded that Mr. Phillips "was [not] doing anything manipulating anyone in any manner to try to get information from Mr. Williams in violation of his right to counsel" and denied the appellant's motion to suppress.

Id., at *9.

## 2.      Applicable Law

In *Massiah v. United States*, 377 U.S. 201 (1964), the United States Supreme Court held that a criminal defendant is denied the Sixth Amendment right to counsel where the prosecution "use[s] against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id*. at 206. Thus, the Sixth Amendment guarantees the accused, after the initiation of formal charges, the right to rely on counsel as a medium between himself and the State. *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The Sixth Amendment right to counsel not only applies to direct confrontations by known government officers but also to "'indirect and surreptitious interrogations'" by covert government agents and informants. *United States v. Henry*, 447 U.S. 264, 269, 274 (1980). (quoting *Massiah*, 377 U.S. at 206)).

"[O]nce a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of a lawyer." *Kuhlmann v. Wilson*, 477 U.S. 436, 457 (1986). In *Kuhlmann*, the Supreme Court observed:

Since the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached[ ] a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action,

14

beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id*. at 459 (internal quotation marks and citations omitted).

The Sixth Circuit has held that absent "direct written or oral instructions by the State to a jailhouse informant," agency is determined by analyzing "the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant." *Ayers v. Hudson*, 623 F.3d 301, 311–12 (6th Cir. 2010); *see also United States v. Mohammed*, 501 F. App'x 431, 445–46 (6th Cir. 2012).

## 2. Discussion

In light of the AEDPA's exacting standard, Petitioner's Sixth Amendment claim must fail. In addressing Petitioner's claim, the TCCA identified *Massiah* and its progeny as the appropriate standard and applied that standard in a reasonable manner. The TCCA first observed that the Sixth Circuit has rejected the bright-line rule that an informant becomes a government agent only when the informant has been instructed to get information from the particular defendant and instead has held that the determination of whether an individual is a government agent depends on the facts and circumstances of each case. *Williams*, 2015 WL 5023136, at *9. The TCCA concluded:

> Under the facts and circumstances of this case, we agree with the trial court that Mr. Phillips was not a government agent. Granted, Mr. Phillips was using a recording device at the direction of the KPD. However, Detective Day gave the recording device to Mr. Phillips in order for Mr. Phillips to record a specific individual, who was not the appellant, with possible information about a cold case. In fact, Detective Day had never even heard of the appellant when he gave the device to Mr. Phillips. In short, nothing indicates that Detective Day must have known that Mr. Phillips was likely to obtain incriminating statements from the appellant in the absence of counsel. Therefore, the trial court properly denied the appellant's motion to suppress.

*Id*., at *10.

In light of the foregoing evidence, the Court cannot conclude that the TCCA's determination that Phillips was not acting as a government agent was objectively unreasonable. Phillips was using the recording device at the instruction of Detective Day to record a different individual. Day was unaware of Petitioner when he gave the recording device to Phillips and Phillips also did not know Petitioner previously. It was Petitioner who initiated the conversation with Phillips, and, although Phillips did seem to "start pumping Petitioner for information," there is nothing in the record to indicate that Day must have known that Phillips was likely to obtain information from Petitioner in the absence of counsel. Again, Day was not even aware of Petitioner until Phillips brought him the information. In short, there is nothing in the record suggesting that any agreement, either express or implied, existed between Day and Phillips which would support a finding that Phillips was acting as a government agent to obtain information from Petitioner in violation of his right to counsel. *See Ayers*, 623 F.3d at 311–12.

Under the deferential standard of the AEDPA, the Court is satisfied that the decision of the TCCA finding that Phillips was not acting as a government agent is not an unreasonable determination of the facts in light of the evidence. Further, the TCCA's conclusion that Petitioner's Sixth Amendment right to counsel was not violated is neither contrary to, nor an unreasonable application, of Federal law as established in *Massiah* and its progeny. Accordingly, Petitioner's first habeas claim will be **DISMISSED.**

### B. SUFFICIENCY OF THE EVIDENCE

Petitioner's second claim alleges that the evidence presented at trial was insufficient to support his convictions for attempted second degree murder and aggravated assault. Specifically, he contends that one of the victim's admitted he never saw Petitioner, that other witnesses admitted they lied to the police, and that one witness "had a reason to be bias" [Doc. 2 at 6].

Petitioner challenged the sufficiency of the evidence on direct appeal and the TCCA adjudicated the claim on the merits. Taking the evidence in the light most favorable to the State, the TCCA concluded that a reasonable jury could have concluded that the evidence was sufficient to support Petitioner's convictions of attempted second degree murder and aggravated assault. *Williams*, 2015 WL 5023136, at *6-7. Respondent contends that the decision of the TCCA is entitled to deference under § 2254(d).

### 1. Applicable Law

The Due Process Clause of the Fourteenth Amendment protects an accused against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364. When a habeas petitioner challenges his conviction based upon insufficient evidence the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 at 324.

"This standard is even more exacting" under § 2254, as a review of the state court's merits determination must be made "through AEDPA's deferential lens." *Hill v. Mitchell*, 842 F.3d 910, 933 (6th Cir. 2016). Thus, in giving proper deference both to the verdict and to the state court opinion upholding that verdict, even if the Court were to "'conclude that a rational trier of fact could *not* have found the petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state *appellate court's* sufficiency determination as long as it is not unreasonable." *Id*. at 933–34 (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).

### 2. Discussion

In light of this exacting standard, Petitioner's challenge to the sufficiency of the evidence supporting his convictions must fail. Although the TCCA did not cite to any United States

Supreme Court precedent in its analysis, it is clear that it applied the *Jackson* standard by taking the evidence in the light most favorable to the state and concluding that a reasonable and rational jury could have concluded that the State had proved the essential elements of the offenses charged. *Williams*, 2015 WL 5023136, at \*6-7. Accordingly, the AEDPA's deferential standard applies to the Court's review of the TCCA's merits adjudication. *See Slagle v. Bagley*, 457 F.3d 501, 513–14 (6th Cir. 2006) ("The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them . . . it is sufficient that the result and reasoning are consistent with Supreme Court precedent").

Here, the TCCA's analysis is consistent with the Supreme Court precedent outlined in *Jackson*. The TCCA first identified the elements of second degree murder, attempt and aggravated assault under Tennessee law. *Williams*, 2015 WL 5023136, \*6 (citing Tenn. Code. Ann. §§ 39–13–210, 39-12-101(a) and 39-13-101(a)(2)—102(a)(1)(A(iii)).

The TCCA then summarized the relevant evidence supporting Petitioner's conviction of attempted second degree murder as follows:

> Taken in the light most favorable to the State, the evidence shows that on June 5, 2012, the appellant was sitting in the back seat of a car being driving by Mackenzie Coleman. As the car was traveling on Martin Luther King Avenue, the appellant saw Mr. Bennett, Mr. McRae, and Mr. McClanhan walking and told Ms. Coleman to stop. When Ms. Coleman stopped the car, the appellant got out; yelled, "Celos" and "Athens Park"; and fired three or four shots at Mr. Bennett. Mr. Bennett, having been shot previously, looked down at his chest to see if he had been hit and ran away. Mr. McRae and Mr. McClanhan also ran. Although the appellant claims that the evidence is insufficient to support his attempted murder conviction because Mr. Bennett was thirty to fifty yards away at the time of the shooting, we note that Mr. Bennett initially estimated that he was twenty-five to thirty yards from the Maxima. Regardless of the distance, the evidence shows that the appellant recognized Mr. Bennett and intentionally shot at him. Therefore, a reasonable jury could have concluded that the appellant knowingly tried to kill Mr. Bennett.

*Id.*, \*6.

As to the aggravated assault convictions, after setting forth Tennessee law on establishing the "fear" element, the TCCA found as follows:

> the evidence established that the appellant fired three or four shots at Mr. Bennett as Mr. Bennett, Mr. McRae, and Mr. McClanhan were walking together. As soon as the victims heard the gunshots, they ran. Mr. Bennett even testified that he looked down at his chest to see if he had been shot. Clearly, from these facts, a rational jury could have inferred that Mr. McRae's and Mr. McClanhan's running away resulted from their imminent fear of being harmed. Therefore, the evidence is sufficient to support the convictions.

*Id.*, *7.

In light of the foregoing evidence as outlined by the TCCA, the inferences that Petitioner was guilty of attempted second degree murder and aggravated assault are reasonable ones, and the Court must presume that both the jury and the TCCA resolved any reasonable conflicting inferences in favor of the prosecution. *See Copeland v. Tiseo*, 645 F. App'x 500, 506 (6th Cir. 2016).

Although Petitioner now questions the credibility of some of the witnesses, under *Jackson*, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence). Moreover, "[t]he trier of fact . . . holds 'the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Tibbs v. Florida*, 457 U.S. 31, 45 n. 21 (1982) (quoting *Jackson*, 443 U.S. at 319)). Thus, it is not for this Court to reweigh the evidence, re-evaluate the credibility of the witnesses, or substitute its judgment for that of the trier of fact. *See Brown*, 567 F.3d at 205.

Under the doubly deferential standard of *Jackson* and the AEDPA, the Court is satisfied that the evidence presented at Petitioner's trial was sufficient for a rational trier of fact to find beyond a reasonable doubt all of the essential elements of the crimes of second degree murder and aggravated assault, and further that the decision of the TCCA so finding was objectively reasonable. Accordingly, because the decision of the TCCA that the evidence was sufficient to support Petitioner's convictions was neither contrary to, nor an unreasonable application of, Federal law as established in *Jackson*, nor based on an unreasonable determination of the facts in light of the evidence, his second habeas claim will be **DISMISSED**.

### C.    SENTENCING ENHANCEMENT

Petitioner's third habeas claim is that the trial court erred in enhancing his sentence based upon his juvenile criminal history [Doc. 2]. He contends that the trial court's consideration at sentencing of his juvenile criminal record, which included adjudications for carjacking and aggravated robbery, [Doc. 22-1 at 30], violated his right to due process under the United States Constitution [Doc. 2 at 15; Doc. 14 at 1–2]. Respondent contends that Petitioner has procedurally defaulted any federal constitutional claim relating to the use of juvenile adjudications to enhance his sentence because his challenge to the enhancement on direct appeal was presented solely under state law.

### 1.    Applicable Law

Before a federal court may review a federal claim raised in a habeas petition, it first must determine whether the petitioner has exhausted the remedies available in state court. *See* 28 U.S.C. § 2254(b)(1). If a federal habeas claim has not been presented to a state court for adjudication, then it is unexhausted and may not properly serve as the basis of a federal habeas petition. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

The exhaustion "requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Wilson v. Mitchell*, 498 F.3d 491, 498–99 (6th Cir. 2007) (quoting *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)). Under Tennessee Supreme Court Rule 39, a Tennessee prisoner exhausts a claim by raising it before the TCCA. *See Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003).

A federal court will not review claims that were not entertained by the state court due to the petitioner's failure (1) to raise those claims in the state courts while state remedies were available, or (2) to comply with a state procedural rule that prevented the state courts from reaching the merits of the claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). A petitioner who fails to raise a federal claim in the state courts and who is now barred by a state procedural rule from returning with the claim to those courts has committed a procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default forecloses federal habeas review, unless the petitioner can show cause to excuse the failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Id*. at 750.

### 2. Discussion

Petitioner's third claim alleges that the trial court erred in using his juvenile criminal history to enhance his sentence [Doc. 2 at 8]. Petitioner's claim is framed as a violation of the "constitutional interests of minors" and the Due Process Clause of the United States Constitution [*Id*.; Doc. 3 at 25; Doc. 14 at 2]. However, Petitioner did not fairly present any federal constitutional claim to the state court. Although Petitioner argued on direct appeal that the trial court improperly enhanced his offender classification to a Range II, multiple offender based on his

juvenile adjudications under Tennessee Code Annotated § 40-35-106(b)(3)(B), he invoked no federal constitutional provision nor cited any federal case law in support [Doc. 22-15 at 17–19].

Exhaustion of state remedies "requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the ''opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275)). "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan*, 513 at 365–66. Thus, before seeking a federal writ of habeas corpus, a state prisoner must fairly present his claim to each appropriate state court by alerting that court to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

In this case Petitioner did not cite to *any* provision of the United States Constitution in his brief to the TCCA on direct appeal nor cite to a single Supreme Court or federal case in support of his claim. *Cf., Dye v. Hofbauer*, 546 U.S. 1, 3–4 (2005) (claim that featured citations to specific provisions of the Constitution and four federal cases alerted the state court that the claim "was based, at least in part, on a federal right"); *Trimble v. Bobby*, 804 F.3d 767, 781 (6th Cir. 2015) (federal claim clearly presented to state court where claim explicitly invoked three separate federal constitutional provisions and four Supreme Court cases in support).

Petitioner's failure to alert the TCCA to any federal constitutional claim arising from the use of juvenile adjudications to enhance is sentence is confirmed by the TCCA's decision on direct review, as the appellate court analyzed and denied Petitioner's claim *solely* under Tennessee state law. *Williams*, 2015 WL 5023136, at *11–12.

Because Petitioner failed to fairly present his challenge to the enhancement of his sentence based on juvenile adjudications as a federal constitutional claim to the TCCA on direct appeal, he failed to exhaust that claim, and he now is precluded from returning to state court to pursue it. Accordingly, his claim is procedurally defaulted. Moreover, Petitioner has asserted no cause for not raising that issue as a federal constitutional claim on direct appeal, nor has he asserted prejudice arising from the procedural default of that claim

Finally, Petitioner cannot establish "actual innocence" as an exception to the procedural default rule. The Supreme Court has held that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). However, "actual innocence" is an extremely narrow exception, and "claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 321. This is not an extraordinary case.

Accordingly, Petitioner's third habeas claim alleging trial court error in enhancing his sentence based upon his juvenile criminal history will be **DISMISSED**.

### 3. Motion for Leave to Supplement

On March 21, 2019, Petitioner filed a "motion for leave to supplement the record in support of his § 2254 petition" pursuant to Rule 15(d) of the Federal Rules of Civil Procedure [Doc. 32].[1] Petitioner wishes to "supplement" his petition with two new theories in support of his third habeas claim that the trial court erred in using his juvenile history to enhance his conviction. Specifically,

---

[1] Rule 15(d) of the Federal Rule of Civil Procedure authorizes a court to permit a party to serve a supplemental pleading "setting out any transaction, occurrence or even that happened after the date of the pleading to be supplemented."

he now argues that the use of his prior adjudications violated the Ex Post Facto clause of the United States Constitution, and that he was not fairly apprised at the time he pled to the juvenile adjudications that they might be used against him in the future, in violation of Due Process [Doc. 32 at 2–6].

Although captioned as a motion to "supplement," Petitioner's motion more accurately is to be construed as a motion to amend his § 2255 motion, since it essentially seeks to add two entirely new claims to his original pleading. *See Michael v. Ghee*, 498 F.3d 372, 386 (6th Cir. 2007) (a Rule 15(a) motion for leave to amend, not a Rule 15(d) motion to supplement, is the appropriate mechanism through which a party may assert additional claims for relief); *United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002) (within the meaning of Rule 15, supplements relate to events that have transpired since the date of the original pleading, while amendments typically rely on matters in place prior to the filing of the original pleading).

In any event, the Court finds no basis to permit Petitioner either to amend or supplement his pleading to add these new theories in support of his third habeas claim because Petitioner did not raise either of these theories to the state court, and he now is precluded from doing so. Because any claim based on these new theories would be procedurally barred, and Petitioner has asserted neither cause nor prejudice, federal habeas review of such a claim is foreclosed. *Coleman*, 501 U.S. at 750. Since supplementing the record to add these new theories would be futile, Petitioner's motion to supplement [Doc. 32] will be **DENIED**.

## V.    CONCLUSION

For the reasons set forth herein, the Court finds that none of Petitioner's claims warrant the issuance of a writ of habeas corpus. Accordingly, Petitioner's § 2254 petition [Doc. 2] awill be

**DENIED** and this action will be **DISMISSED WITH PREJUDICE**. Petitioner's motion for leave to supplement the record [Doc. 32] will be **DENIED**.

## VI.    CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA) should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c)(1), a petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

Where claims have been dismissed on their merits, a petitioner must show reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A petitioner whose claims have been rejected on a procedural basis must demonstrate that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*; *see also Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001).

Here, the Court finds that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to any of his claims. Specifically, jurists of reason would not debate the Court's finding that Petitioner failed to exhaust and procedurally defaulted his third habeas claim. Nor has Petitioner shown that reasonable jurists would find the Court's assessment of Petitioner's remaining constitutional claims debatable or wrong. Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA **SHALL NOT ISSUE**.

**AN APPROPRIATE ORDER WILL ENTER.**

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE